IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CENTENNIAL MEDICAL GROUP, INC., )
)
Plaintiff, ) TC-MD 130169D
)
v. )
)
DOUGLAS COUNTY ASSESSOR, )
)
Defendant. ) **FINAL DECISION**

The court entered its Decision in the above-entitled matter on May 20, 2014. The court

did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days

after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

Plaintiff appeals Defendant's letter dated January 7, 2013, denying Plaintiff's application

for a tax exemption for property identified as Account R119934 (subject property) for the 2012-

13 tax year. Plaintiff filed five related appeals concerning the taxation of property located at

three separate locations: the "Edenbower Boulevard Facility" (TC-MD 130169D); the

"Gastroenterology Facility" (TC-MD 120697D and TC-MD 120748D); and the "Urology

Facility" (TC-MD 120698D and TC-MD 120751D).

Trial in all five matters was held March 11-12, 2014, in the Oregon Tax Courtroom,

Salem, Oregon. Brad S. Daniels, Attorney at Law, appeared on behalf of Plaintiff. Paul E.

Meyer, Douglas County Counsel, appeared on behalf of Defendant. Rahul Agarwal (Agarwal),

Vice President for Business Development, Mercy Medical Center, Inc., testified on behalf of

Plaintiff.

/ / /

Plaintiff's Exhibits 1 through 32 and 35 through 40 and Defendant's Exhibits A through NN were admitted without objection.

## I.    STATEMENT OF FACTS

Plaintiff states that it is a "multi-specialty physician clinic that provides primary care and urgent care services at its CMG Edenbower Boulevard Facility and provides specialty medical care at its Gastroenterology Facility and its Urology Facility." (Ptf's Trial Memo at 3.) Agarwal testified that Centennial Medical Group, Inc. (CMG), was formed as an Oregon nonprofit corporation on January 1, 2009, and received notification from the Internal Revenue Service on November 4, 2011, that it was "exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code." (Ptf's Ex 6.) Plaintiff's Articles of Incorporation stated that it "is organized exclusively for religious, charitable, scientific and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended[.]" (Ptf's Ex 4 at 2.) Plaintiff's Bylaws stated:

> "The mission of the Corporation and of Catholic Health Initiatives is to nurture the healing ministry of the Roman Catholic Church by bringing it new life, energy, and viability in the Twenty-First Century. Fidelity to the Gospel urges us to emphasize human dignity and social justice as it moves toward the creation of healthier communities. Catholic Health Initiatives, sponsored by a lay-religious partnership, calls other Catholic sponsors and systems to unite to ensure the future of Catholic health care. To fulfill this mission, the Corporation and Catholic Health Initiatives, as values-based organizations and in partnership with laity and others, will assure the integrity of the ministry in both current and developing organizations and activities; research and develop new ministries that integrate health, education, pastoral, and social services; promote leadership development throughout the entire organization; advocate for systemic changes with specific concern for persons who are poor, alienated, and underserved; and steward resources by general oversight of the entire organization."

(Ptf's Ex 5 at 6.) Agarwal testified that Plaintiff's Bylaws specified that at the time of liquidation all assets remaining after payment of outstanding liabilities would pass to an

/ / /

"exempt" organization or be disposed of for "exempt purposes." (Ptf's Ex 4 at 9.) Agarwal testified that he is one of three members of the board of directors.

Agarwal testified about the demographics of Plaintiff's service area and the "challenges" of recruiting physicians to provide "adequate physician care" to the community. (Ptf's Exs 24, 31, 32.) The Physician Development Plan stated:

> "The demographics and socio-economics of Douglas County are reflected in the payer mixture of Mercy Medical center. Financially the hospital is negatively affected by the increased numbers of Medicare and Medicaid enrolled members. The ACA and statewide efforts provide as of yet unclear opportunities as more lives are expected to be shifted to and covered by Medicaid and Medicare. The shifting demographics will concurrently increase the number of Medicare covered lives in the county."

(Ptf's Ex 24 at 30.)

On September 1, 2011, Plaintiff entered into a Practice Transition Agreement with among others, Evergreen Family Medicine, P.C., "to ensure the availability of high quality medical care in Douglas County, Oregon[.]" (Ptf's Ex 25 at 2.) Agarwal testified that the parties to the Practice Transition Agreement entered into a Professional Services Agreement, stating that the Practice Group, including Evergreen Family Medicine, P.C., a group of licensed medical professionals engaged in the practice of medicine, would

> "* * * operate all management, operational, and professional aspects of the practice without involvement of CMG save that required to protect CMG's tax exempt status under federal, state, and local laws, be consistent with CMG's policies for Charity Care, and remain in compliance with the Ethical and Religious Directives for Catholic Health Care Services * * *."

(Ptf's Ex 26 at 1-2.) Plaintiff's "Uninsured/Underinsured Patient Discounts (Charity Care)" policy stated:

> "POLICY
>
> "Centennial Medical Group (CMG) is called upon to meet the needs of patients who seek care, regardless of their financial abilities to pay for services

provided. * * * Financial Assistance/Charity Care may be provided to patients who are uninsured, underinsured or determined to be medically indigent.

"*Prior to applying for Financial Assistance/Charity Care, patients will also be asked to apply for Medicaid. Financial Assistance/Charity Care is secondary to all other financial resources available to the patient, including group or individual medical plans, worker's compensation, Medicare, Medicaid or medical assistance programs, and other state, federal or military programs. Financial Assistance/Charity Care is also secondary to third party liability situations (e.g., auto accident or personal injuries) or any other situation in which another person or entity may have a legal responsibility to pay for the costs of a patient's medical services.*

"* * * * *

"DETERMINATION

"Eligibility for charity care discounts is determined based on 130% of the annually updated HUD Geographic Very-Low Income Guidelines (VLIG) as well as the patient/guarantor's available assets, and any extenuating circumstances, and CMG does not lower the income levels below the CHI-defined standard of 130% of the HUD VLIG (i.e., the new base). Patients who required non-emergent care must be residents of CMG's service area to be eligible for charity care discounts.

"* * * An individual's occupation may be indicative of eligibility for a charity care discount.

"* * * * *

"CMG shall make a subjective decision about a patient/guarantor's medically indigent status by reviewing formal documentation for any circumstance in which a patient is considered eligible for a charity care discount on the basis of medical indigence.

"PROCEDURE

"Financial Assistance Application Process for Current Patients:

"* * * * *

"7. Once the determination for eligibility for Financial Assistance has been established (25%, 50%, 75% or 100%), that percentage will be applied to the outstanding balance at that time. *No refunds will be issued for prior payments made, and any balances that have already been sent to collections will not be cancelled with the collection agency.*

"* * * * *

"Financial Assistance Process for New (never been seen) Patients:

"1. *New patients with no insurance may apply for Financial Assistance, but will need to pay the lesser of either the self-pay discount price for that service or a $100 minimum at the time of service.* This minimum payment shall be due the first time a patient receives services at each individual CMG practice.

"* * * * *

"Financial Assistance Coverage/Exclusions:

"1. Financial Assistance will *not* be granted for:

"* * * * *

"b. *Any balances (coinsurance, deductible, etc.) that are due to the patient selecting an HMO and being seen out of network.*

"c. *DME (Durable Medical Equipment)*

"* * * * *

"e. *All preventative care (Complete Physical Exams, Sports Physicals, immunizations, etc.)*

"*Providing Financial Assistance to Patients*

"1. * * * CMG evaluates all available financial resources – not only of the patient, but of other persons having legal responsibility to provide for the patient, such as a parent of a minor patient, or the spouse of a patient – before determining financial assistance eligibility. The patient/guarantor shall be required to provide information and verification of ineligibility for benefits available via insurance (individual and/or group coverage), Medicare, Medicaid, Workers' Compensation, third-party liability (personal injury payments, etc) and other programs.

"* * * * *

"C. Medical Indigency

"The decision about a patient's medical indigency is fundamentally determined by CMG without giving exclusive consideration to a patient's income level when a patient has significant and/or catastrophic medical bills. * * *.

"* * * * *

"In most cases, the patient shall be expected to pay some amount of the medical bill, but CMG shall not determine the amount for which the patient shall be responsible based solely on the income level of the patient.

"* * * * *

"*D. Presumptive Eligibility for Charity Care*

"There are occasions when a patient may appear eligible for a charity care discount, but there is no financial assistance form on file because documentation was lacking that would support the provision of financial aid. * * * This presumptive eligibility, when properly documented internally by CMG's staff, is sufficient to grant a charity care discount to patients who qualify. Once determined, due to the inherent nature of the presumptive circumstances, the only discount that can be granted to the patient by CMG is a 100% write-off of the account balance."

(Ptf's Ex 17 at 1-4, 6-7 (emphasis added).) The passages are emphasized to note Defendant's concern that applicants are required to seek financial assistance from others before requesting financial assistance from Plaintiff; that those individuals requesting refunds and financial assistance are subject to restrictions; that new patients are required to make a minimum payment; and that financial aid exclusions apply.

Agarwal testified that "the Charity Policy is a way for CMG to qualify patients for charity care but CMG does not limit care for those who don't qualify [*i.e.*, who do not complete an application and seek assistance from other agencies or sources] for care." Defendant asked "how CMG's doors are open to rich and poor alike if a patient has to live in the CMG service area?" which Agarwal defined as Douglas County. Agarwal responded, stating that "in reality, an individual gets ER/Urgent care if outside the service area." Agarwal was questioned about Plaintiff's review of "formal documentation" to make a "subjective decision about a patient/guarantor's medically indigent status." (Ptf's Ex 17 at 2.) Agarwal testified that it is in the "best interests of CMG to have patients go through the charity process because a bad debt is an expense and bad debts cannot be recorded as community benefit." He testified that the "minimum payment" for new patients is an "incentive for them to go through the policy charity process first before they receive medical assistance." Agarwal testified that the "CMG charity

policy does not apply to the OCCU Health Program which is a contracted service provided to employers who required employee annual physicals, hearing tests and other fitness to work tests."

Agarwal testified that billings sent to patients include the following statement:

"* * * [*sic*] ATTENTION * * * [*sic*] IF YOU DO NOT HAVE INSURANCE AND FEEL YOU MIGHT QUALIFY FOR FINANCIAL ASSISTANCE, PLEASE CALL OUR OFFICE AT * * *."

(Ptf's Ex 22 at 2.) Agarwal reviewed emails sent to Plaintiff, expressing appreciation for financial assistance and services. (Ptf's Ex 21.) When questioned, Agarwal admitted that it was unclear if all the emails were sent to Plaintiff or its parent, Mercy Medical Center, concluding that "three listed CMG providers."

In response to questions, Agarwal testified that the Physician Contracting Committee (Section 8.5 of the Bylaws) and the Physician Practice Advisory Committee (Section 8.6 of the Bylaws) are not "functioning committees." (Ptf's Ex 5 at 18-19.) Agarwal testified that the "joint operating committee makes decisions by consensus; it was designed to be shared governance and it works."

Agarwal testified that Plaintiff does business as Evergreen Family Medicine, a "division of Centennial Medical Group" (TC-MD 130169D). In response to questions, Agarwal testified that "Centennial Medical Group East, LLC," not Plaintiff, "does business as Evergreen Family Medicine." (*Cf*. Def's Exs HH, II, JJ.) He testified that Centennial Medical Group East, LLC, is the "actual owner of the provider ID" and is a "wholly owned subsidiary of CMG Inc." (Transcript at 187-88.) Agarwal testified that "we try very hard to refer to CMG East and CMG Inc. together" and that "[w]e don't really do any other activity for CMG East separately." (*Id*. at 190.) Agarwal testified about the "elements of the practice," stating that Plaintiff "leased the space and equipment from Evergreen Property Investments"; "contracted for physician services";

"hired and employed mid-level staff [*i.e.*, nurse practitioners and physician assistants]"; "handled the billing" using Plaintiff's "ID"; and "assumed financial responsibility and risk liability." (*See generally* Ptf's Ex 26.) In response to questions, Agarwal testified that the owners of Evergreen Property Investments LLC "leased the property to the hospital" and the hospital leased the property to Centennial Medical Group Inc. (Transcript at 227-28.) Agarwal testified that a "joint operating committee" meets regularly in accordance with the terms of "Management Services Agreement" to ensure that "CMG's policies and procedures are followed." (*See* Ptf's Ex 27 at 13-15.) Agarwal testified that Evergreen Family Medicine is no longer "an owner"; it is a "vendor and operator." Agarwal testified that "CMG took on the risk, but physicians have the relationship with patients and patient care is driven by physicians."

Agarwal testified that "broadly speaking EFM [Evergreen Family Medicine] is closed to new patients" and has been for "nine to twelve months." (*See also* Ptf's Ex 23.) Agarwal testified that the ability to keep "the practice open" is "driven by ability to bring more doctors into the practice" and he is "not sure when provider capacity will be attained." He testified that even though the Urgent Care website stated that Urgent Care is "not accepting new patients at this time," emergent patients are not turned away. (Def's Ex Y.) Agarwal acknowledged when asked that the Evergreen Family Medicine website does not include Plaintiff's charity policy among its list of patient resources, its new patient packet, and its frequently asked questions page. (*Cf.* Ptf's Ex 23 at 7, 11, 18.)

Agarwal testified that on June 1, 2011, Plaintiff doing business as Roseburg Urology leased property (TC-MD 120698D and TC-MD 120751D) and opened a "specialty practice," employing physicians who agreed to "follow CMG's charity policies and guidelines." (Ptf's Ex

/ / /

11.) Agarwal testified that "all new patients that are uninsured or if a patient requests it" receive the Roseburg Urology "financial assistance forms," that include the following information:

> "Centennial Medical Group offers a variety of opportunites [*sic*] to assist with non-elective medical treatment, whether it be absorbing part of the cost based on need or helping to identify community or governmental programs to fit your needs. *This program does not cover elective medical services or services received at Parkway Medical Supply.*

> "If you wish to apply for financial assistance for your account, please complete the attached application and return it in the envelope provided. Your situation will be evaluated based on the national criteria for *poverty level income.* **\* \* \*.**

> "*You must continue to make payments on the account while this application is being reviewed.*"

(Ptf's Ex 19 at 9 (emphasis in original); *see also* Ptf's Ex 19 at 3, 5.) Agarwal agreed that the Roseburg Urology website is "accurate but not comprehensive," that it does not include the statement that Roseburg Urology is a division of CMG, and that it has no links to CGM. (*See* Def's Ex X.) In response to questions, Agarwal testified that Roseburg Urology is "owned" by Centennial Medical Group. (Transcript at 257.)

Agarwal testified that "in 2010, CMG took over Dr. Gerald Engstrom's gastroenterology practice, buying the equipment, hiring the staff, assuming the risk liability and billing and instituting CMG's charity care policies." Plaintiff leased property (TC-MD 120697 and TC-MD 120748D). (Ptf's Ex 13.) Agarwal testified that the gastroenterology practice uses "identical financial assistance applications" as the Roseburg Urology Group and Evergreen Family Medicine. (*Cf.* Ptf's Ex 20 at 8.) Questioning from Defendant's attorney elicited testimony from Agarwal as follows:

> "Q.    Can you tell us what Centennial Medical Group West is or what it does?

> "A.    So Centennial Medical Group West LLC is, again, a wholly owned subsidiary of Centennial Medical Group Inc. Centennial Medical Group West is the practice where Dr. Engstrom's practice lives. And, as we talked in some

detail yesterday, the reason for placing that in a separate LLC was to have a separate provider ID that allows us to accurately track the revenue stream for payments provided for the services rendered in that practice.

"Q.    Okay.  So along those lines, turn to Exhibit K, please.  And this is the business registry page that seems to indicate that the business name Gerald Engstron M.D. is registered to Centennial Medical Group West; correct?

"A.    Correct."

(Transcript at 256-57.)

Agarwal referenced Plaintiff's exhibits for each of the three practice groups (Evergreen Family Medicine, urology, and gastroenterology), stating information including the percentages of Medicaid and Self-Pay (uninsured) patients, as well as the amounts of "charity" adjustments as follows:

| Practice Group | Medicaid | Self Pay | Charity |
|---|---|---|---|
| Evergreen Family Medicine | 13.2% | 12.7% | $132,789 |
| Urology | 12.8% | 3.5% | $35,417 |
| Gastroenterology | 4.9% | 1.9% | $8,550 |

(*See* Ptf's Exs 35-37.)

Agarwal referenced and reviewed two of Plaintiff's exhibits titled, "Gift or Giving Information * * * for Fiscal Year 2013," based respectively on "Forgone Revenue" and "Unreimbursed Cost:"

| Practice Group | Forgone Revenue As percentage of net revenue | | | Unreimbursed Cost As percentage of total cost of care | | |
|---|---|---|---|---|---|---|
| | Indigent | Medicaid | Total | Indigent | Medicaid | Total |
| Evergreen Family Medicine | 0.26% | 4.80% | 5.06% | 0.26% | 4.69% | 4.95% |
| Urology | 1.22% | 4.44% | 5.66% | 1.22% | 6.35% | 7.57% |
| Gastroenterology | 2.60% | 2.13% | 4.72% | 2.60% | 2.87% | 5.47% |

(Ptf's Exs 38-39.)  Agarwal testified that the foregone revenue and unreimbursed costs include both indigent care and Medicaid patients.  Agarwal was asked about the differences between the

/ / /

2013 and 2012 reported foregone revenue. (*See* Def's Ex Z.) In response, Agarwal testified that each year "depends on the willingness of patients to go through the charity care process."

In response to questions, Agarwal testified that the Centennial Medical Group operates a "cardiology practice, we have another general surgeon, we have orthopedics, we have another GI practice, we have a pulmonology critical care, we have a hospitalist group, we have pathologists. And we already talked about urology, about Dr. Engstrom's practice and about Evergreen Family Medicine." (Transcript at 251.) Agarwal further testified regarding CMG's "OccuHealth program," stating that "the OccuHealth program is typically a service that is provided to employers[.]" (Transcript at 254.) Agarwal testified that the other practices are operated at various locations.

## II. ANALYSIS

The issue before the court is whether Plaintiff's property qualifies for property tax exemption under ORS 307.130.[1] ORS 307.130(2) and ORS 307.130(2)(a) provide, in relevant part, that the tax exemption for property owned by charitable institutions applies only to "such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the * * * charitable * * * work carried on by such institutions." The parties acknowledge without explanation that because Plaintiff leases the subject property from or to another not-for-profit entity ORS 307.112 and ORS 307.166 are applicable to the issue before the court.

Before addressing the issue of whether Plaintiff meets the statutory requirements of ORS 307.130, the court considers Defendant's question: "[W]hich entity is the 'charitable institution' that is the subject of the charity analysis and the consequences of that determination[?]" (Def's Closing Arg at 1.) Defendant alleged that "separate legal" entities " 'must individually qualify as

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

charitable institutions' (unless some kind of exception exists)." (*Id*. at 3-4.) Defendant stated that the "Evergreen Family Medicine urgent care and family medicine practice" is "registered to Centennial Medical Group East, LLC[,]" and that "[t]he Centennial Medical Group East, LLC cases have been dismissed." (*Id*.) Agarwal testified that Centennial Medical Group East, LLC, is a "wholly owned subsidiary of" Plaintiff. (Transcript 187-88.)

In a recent decision, the court addressed in the context of ORS 307.130 the issue of one legal entity leasing the real property at issue to another related legal entity. *Serenity Lane, Inc. v. Lane County Assessor (Serenity Lane)*, __OTR__ (Aug 30, 2013). The court concluded that "ORS 307.130 cannot apply directly to" the entity leasing the subject property "because by its own terms the statute applies only to 'property owned or being purchased' by a qualifying institution." *Id*. (Emphasis omitted.) The applicable statute is ORS 307.166(1). The court summarized that statute as follows:

> "[I]f an institution that is entitled to claim exemption from property tax under a provision of ORS chapter 207 leases its property to another institution that is also entitled to claim exemption from property tax for property that it owns, then the property remains exempt from property tax as long as the lessee institution uses the property in the manner required under the statute that would entitle that lessee institution to claim exemption for the property if it owned the property."

*Id*. (Slip op at 6.) The court concluded that each legal entity "must individually qualify as [a] charitable institution[] to satisfy the terms of ORS 307.166." *Id*. (Slip op at 7.) In *Serenity Lane*, the court noted that in prior cases,

> "when presented with analogous separations of administrative functions from the substantive work of a charitable institution, that property devoted to the administrative functions of an otherwise charitable institution is exempt when it is not used in a profit-making business and is used for the advancement of the charitable work of the institution."

(*Id*.)

/ / /

In the case before the court, the subject property is owned by an entity that leases the subject property to Mercy Medical Group and Mercy Medical Group leases it to Plaintiff.[2] Plaintiff referenced a Sublease Agreement between Mercy Medical Center, Inc., and Plaintiff. (Ptf's Ex 7.) Plaintiff stated that "CMG was formed as an Oregon nonprofit corporation on January 1, 2009 to increase access to quality clinical physician services for the residents of Douglas County, Oregon, the service area of its sole member Mercy Medical Center, Inc." (Ptf's Post-Trial Memo at 3.) Plaintiff stated that Mercy Medical Center, Inc., is "an Oregon nonprofit corporation." (*Id.*) Mercy Medical Center, Inc., the entity leasing the subject property to Plaintiff, is a wholly owned subsidiary of Plaintiff and was not a named party in the above-entitled matter.

In the case before the court, the only named Plaintiff is Centennial Medical Group, Inc. Plaintiff stated that Mercy Medical Center, Inc., leases the subject property to Plaintiff. Agarwal testified that "Centennial Medical Group East, LLC," not Plaintiff, "does business as Evergreen Family Medicine" at the leased subject property. He testified that Centennial Medical Group East, LLC, is the "actual owner of the provider ID" and is a "wholly owned subsidiary of [Plaintiff]." (Transcript p. 187-88.) Plaintiff's Post-Trial Memorandum stated that "CMG East" was "formed for the sole purpose of accounting administration with respect to separate provider ID numbers" and is not "the lessee of any of the property at issue." (Ptf's Post-Trial Memo at 23 n 12.)

Like *Serenity Lane*, the "administrative functions" and "substantive work" of Plaintiff and Centennial Medical Group East, LLC, are separated. Other than the previously recited

---

[2] Agarwal testified that the owners of Evergreen Property Investments LLC "leased the property to the hospital" and the hospital (Mercy Medical Center, Inc.) leased the property to Centennial Medical Group Inc. (Transcript at 227- 28.)

testimony, the court has no information about the activities of Centennial Medical Group East LLC. Agarwal testified that the Centennial Medical Group operates a "cardiology practice, we have another general surgeon, we have orthopedics, we have another GI practice, we have a pulmonology critical care, we have a hospitalist group, we have pathologists. And we already talked about urology, about Dr. Engstrom's practice and about Evergreen Family Medicine." Agarwal also testified that CMG had an "OccuHealth program" and that other practices are operated at various locations.

An exemption from ad valorem taxation is granted to an "organization overall and not to any specific part or operation." *Mercy Medical Center, Inc. v. Dept. of Rev.,* 12 OTR 305, 307 (1992). The Oregon Supreme Court set forth a "three-part test that must be met in order for an organization to qualify as a 'charitable institution' under ORS 307.130:

> " '(1) [T]he organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving.' "

*Id.* (Quoting *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991).)

Other than the information stated in Agarwal's testimony, the court has limited information about the activities of Centennial Medical Group and Centennial Medical Group East LLC. The court has insufficient evidence to determine whether Plaintiff's "organization overall," including not only Evergreen Family Medicine but other medical practices identified by Agarwal as owned and operated by Plaintiff, has "charity as its primary, if not sole object"; whether "the organization * * * [is] performing in a manner that furthers its charitable object"; and whether "the organization's performance * * * involve[s] a gift or giving." *Id.*

Even though Agarwal testified that the medical practice using the subject property is Centennial Medical Group East, LLC, doing business as Evergreen Family Medicine, Plaintiff

stated that Centennial Medical Group East LLC should be "disregarded" because it is a "single-member limited liability company" and is not the "lessee of any of the property at issue." (*Id*.) Centennial Medical Group East, LLC, cannot simply be disregarded because, pursuant to ORS 307.166, Centennial Medical Group East, LLC, and Plaintiff must each individually qualify as charitable institutions to make the subject property eligible for ad valorem property tax exemption. *See Serenity Lane*, __OTR at __(slip op at 7).

## III.  CONCLUSION

The court has insufficient evidence to determine whether Plaintiff's property is exempt from ad valorem taxation. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that the trial scheduled for the above-entitled matter on June 10-12, 2014, to determine whether the lease for the subject property meets the statutory requirement and whether the rent is at or below fair market value is canceled .

Dated this ____ day of June 2014.

 

 

|   |
| --- |
| JILL A. TANNER<br>PRESIDING MAGISTRATE |

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This Final Decision was signed by Presiding Magistrate Jill A. Tanner on June 6, 2014.  The Court filed and entered this Final Decision on June 6, 2014.*